XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
ANNA T. FERRARI (SBN 261579)
Deputy Attorney General
SHARON L. O'GRADY (SBN 102356)
Deputy Attorney General
 455 Golden Gate Ave., Suite 11000
 San Francisco, CA 94102
 Telephone: (415) 510-3834
 Fax: (415) 703-1234
 E-mail: Sharon.OGrady@doj.ca.gov
*Attorneys for Plaintiffs State of California and
California High-Speed Rail Authority*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA;** and **CALIFORNIA HIGH-SPEED RAIL AUTHORITY,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF TRANSPORTATION**; **ELAINE L. CHAO**, in her official capacity as Secretary of the Department of Transportation; **THE FEDERAL RAILROAD ADMINISTRATION; RONALD L. BATORY**, in his official capacity as Administrator of the Federal Railroad Administration,<br><br>Defendants.<br>. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

**INTRODUCTION**

1.       The State of California and the California High-Speed Rail Authority ("Authority") bring this action for declaratory and injunctive relief challenging the Federal Railroad Administration's decision to terminate and de-obligate nearly $1 billion in federal grant funding for the California high-speed rail project.  The high-speed rail project, the first of its kind in United States history, is a critical part of California's long-term strategic planning, not only to address critical transportation needs, but also greenhouse gas emissions and climate change.

2.       The Authority and the Federal Railroad Administration ("FRA") have been collaborating for over a decade on this historic program, and the State has committed billions of dollars to it.

3.       California has performed its obligations on the project, and construction is well-advanced, furthering the goal of the Congressional appropriation that funds the grant—to fund cooperative agreements for the development of segments or phases of intercity or high-speed rail corridors.

4.       In the last year, however, the FRA has stopped cooperating on the project, including refusing to process important environmental clearances, and to count hundreds of millions of dollars in state-funded expenditures toward California's obligation to provide matching funds under the grant.

5.       On February 19, 2019—one day after California and fifteen other states filed suit to invalidate President Trump's declaration of emergency at the southern border—President Trump tweeted that the suit was led by California, "the state that has wasted billions of dollars on their out of control Fast Train, with no hope of completion."  One minute later, he tweeted that the "failed Fast Train project in California . . . is hundreds of times more expensive than the desperately needed Wall."  Later that same day, in a curt, three-page letter, the FRA abruptly notified the Authority of its intent to terminate the grant agreement.

6.       On May 16, 2019, the FRA carried out its threat and announced its "final decision" to terminate the grant and de-obligate the remaining funding.  The FRA also signaled its intent to reallocate the money to other inter-city rail projects.

2

7.     The FRA did not make any of the efforts at conciliation or compliance required by its own procedures and policies, and its 25-page termination letter set out a raft of detailed allegations about the Authority's supposed non-compliance with the grant agreement that it did not include in its notice or elsewhere, and that the Authority had no opportunity to rebut before the FRA took action.

8.     FRA's sudden decision to terminate the grant in violation of its own procedures and policies was arbitrary and capricious, an abuse of discretion, and contrary to law, and threatens to wreak significant economic damage on the Central Valley and the State.

9.     For these reasons, and those discussed below, the Court should vacate and set aside the FRA's action terminating the grant and de-obligating nearly $1 billion in federal funding for the project.  The Court also should enjoin Defendants from re-obligating and distributing these funds to any other recipient, or from otherwise transferring the funds.

## JURISDICTION, VENUE, AND INTRA-DISTRICT ASSIGNMENT

10.     This Court has subject matter jurisdiction under 28 U.S.C. sections 1331 and 2201.

11.     An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. section 2201(a), and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. sections 2201 and 2202.

12.     Venue is proper in this judicial district under 28 U.S.C. section 1391(e), because this is a civil action in which Defendants are agencies of the United States or officers of such an agency, no real property is involved in this action, and Plaintiff the State of California resides in this judicial district.

13.     Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) and 3-5(b) because Plaintiff State of California, by and through its Attorney General, maintains an office in San Francisco.

## PARTIES

### I.   PLAINTIFFS

14.     The State of California, represented by and through its Attorney General, is a sovereign State of the United States of America.

15.     The California High-Speed Rail Authority is an instrumentality of the State of California, which is responsible for developing and constructing a high-speed rail system in California.  The Authority is also the grantee under grants from the federal government for constructing new intercity or high-speed rail corridors and for planning future high-speed rail services.

16.     The State and the Authority have standing to bring this action due to the loss of federal grant funds caused by Defendants' wrongful conduct, the resulting delay in development of the California high-speed rail system, and the consequent reduction in economic activity and development in the Central Valley of California, one of the nation's most economically distressed regions.

## II.    DEFENDANTS

17.     Defendant United States Department of Transportation ("DOT") is the federal agency to which Congress has appropriated the grant funds at issue in this case.

18.     Defendant Elaine L. Chao is the Secretary of DOT, oversees the DOT, and is responsible for the actions and decisions challenged in this action.  Defendant Chao is sued in her official capacity.

19.     Defendant Federal Railroad Administration ("FRA") is an agency within DOT which Congress has charged with disbursing and overseeing the grant funds at issue in this case.

20.     Defendant Ronald L. Batory is the Administrator of the FRA and is responsible for the actions and decisions challenged in this action.  Defendant Batory is sued in his official capacity.

## BACKGROUND

## I.    CALIFORNIA'S HIGH-SPEED RAIL PROGRAM

21.     Developing a high-speed rail system has been a long-range strategic goal of California, supported by both Republican and Democratic Governors, for more than three decades.

22.     In 1993, under Governor Pete Wilson, the California Intercity High Speed Rail Commission was established to investigate the feasibility of high-speed rail in California, and

1   concluded that a high-speed rail system in California was technically, environmentally and

2   economically feasible.  Three years later, in 1996, the Legislature passed, and Governor Pete

3   Wilson signed into law, the High-Speed Rail Act, which established the Authority to continue the

4   Commission's work in planning and developing a high-speed rail system.  Cal. Pub. Util. Code

5   § 185000 et seq.

6         23.     In 2008, the Legislature passed, Governor Schwarzenegger signed, and the voters

7   approved Proposition 1A, the Safe, Reliable High-Speed Passenger Train Bond Act for the 21st

8   Century.  Proposition 1A envisions a system of high-speed rail trains stretching from San

9   Francisco through Los Angeles to Anaheim and eventually to Sacramento and San Diego.

10  Proposition 1A divides this system into two phases, the first of which is to connect San Francisco

11  with Los Angeles and Anaheim on a route through the Central Valley.  Proposition 1A also

12  contemplates that the first phase will be built in corridors and smaller "usable segments."

13  *Id*. §§ 2704.04(b)(2), 2704.08(a), (c)(1), (d).

14        24.     Proposition 1A authorizes the issuance of $9.95 billion in general obligation bonds

15  to jump-start construction of the high-speed rail system.  Cal. Sts. & Hy. Code § 2704.04(b).  It

16  provides, however, that, except for certain specified costs such as preliminary engineering

17  activities, bond proceeds may not be used for more than 50 percent of the total cost of

18  construction for each corridor or usable segment of the high-speed rail system.  *Id*.

19  § 2704.08(a), (g).

20        25.     In 2014, the California Legislature provided the Authority with a continuing

21  source of revenue for the high-speed rail system by allocating to the system 25 percent of the

22  revenues from the State's auction of greenhouse gas emissions allowances.

23        26.     The high-speed rail system contemplated by these enactments is a critical element

24  in meeting the State's growing transportation demand, especially for intercity transportation.  The

25  interstate highway system, commercial airports, and the conventional passenger rail system

26  serving the intercity travel market are operating at or near capacity.  In many California regions,

27  freeway and airport expansion is not viable because of existing land use constraints.  And where

28  freeway and airport expansion may be viable in other parts of the state, it would nevertheless

1    require enormous public investments for maintenance and expansion to meet existing demand and

2    future growth that far exceed the cost of high-speed rail.

3         27.    California's high-speed rail system is also critical to the State's environmental and

4    climate change goals.  The system's trains will be powered by electricity, in contrast to airplanes

5    and most automobiles.  The system will improve air quality by reducing vehicle miles travelled

6    by automobile and airplane, thereby reducing criteria pollutant emission from the transportation

7    sector.  In addition, as the California Legislature has found, the high-speed rail system "will

8    contribute significantly toward the goal of reducing emissions of greenhouse gas and other air

9    pollutants" and will provide "the foundation for a large-scale transformation of California's

10   transportation infrastructure" by reducing millions of vehicles miles travelled by automobile and

11   reducing the demand for air travel.  Senate Bill 862 (2014).

12        28.    California's high-speed rail system is also an essential strategy for efficient

13   transportation energy use.  A trip on the high-speed rail system would use one-third the energy of

14   a similar trip by air and one-fifth the energy of a trip made by car.

15        29.    The economic benefits from high-speed rail system construction are significant.

16   An analysis prepared for the Treasury Department estimates net economic benefits from the

17   California high-speed rail project of between $130.3 and $260.6 billion.  The project has

18   employed more than 36,000 people to date and is projected to employ, either directly or

19   indirectly, 100,000 people in the Central Valley.  It will also help the Central Valley become

20   more accessible to the State's major metropolitan areas, thus increasing the economic stimulus.

21   **II.    THE GRANTS FROM THE FEDERAL RAILROAD ADMINISTRATION**

22        30.    In February 2009, Congress enacted the American Recovery and Reinvestment

23   Act, Public Law 111-5 ("ARRA").  ARRA provided $8 billion for high-speed rail and intercity

24   passenger rail projects, but required that FRA obligate the funds no later than September 30,

25   2012, Pub. L. No 111-5, 123 Stat. at 208, and that grant monies be expended by September 30,

26   2017.

27        31.    In 2009, Congress passed the Consolidated Appropriations Act, 2010, Pub. Law

28   111-117, 123 Stat. 3057 ("2010 Appropriations Act"), which provided additional funding for the

development of segments or phases of intercity or high-speed rail corridors.

**A.    The ARRA Grant**

32.    In 2010, the Authority applied for grants under ARRA for infrastructure and track for three portions—the northern, southern, and Central Valley segments—of the first phase of California's high-speed rail system.

33.    FRA approved one portion of the application—the Central Valley segment—and awarded the Authority a grant ultimately totaling about $2.5 billion.  Although ARRA did not require grantees to contribute their own funding, California offered to spend one dollar of its own for every dollar in federal funding it received, using Proposition 1A bond proceeds as the source of state funds.  The agreement that FRA and the Authority executed on September 20, 2010 ("ARRA Grant Agreement") required this state-federal match as a condition of the grant.

34.    Although the ARRA Grant Agreement covered preliminary engineering and environmental work in support of the entire 520-mile segment between San Francisco and Los Angeles and Anaheim, it provided construction funding for only an initial 115-mile portion of infrastructure and track on the segment in the Central Valley, spanning from North of Bakersfield to Fresno (the "Project").

35.    The ARRA Grant Agreement does not contain a time-is-of-the-essence clause. Nor does it create a construction time line or otherwise set a deadline for completing the San Francisco to Anaheim phase of the high-speed rail system.

36.    The scope of work in the ARRA Grant Agreement includes ten tasks, which, in addition to planning and environmental work, encompass construction of infrastructure and track (but not procurement of rolling stock or electrification) on the span from north of Bakersfield to Madera.

37.    The ARRA Grant Agreement also provides for extensive oversight by FRA, including approval of all written agreements with (i) railroads owning property on which the Project would be built, (ii) owners of infrastructure on which the Project would be built, and (iii) the operator of any passenger service benefiting from the Project.  The Agreement also requires FRA approval for, among other things, the Authority's project management plan, project

environmental reviews, preliminary engineering documents, final design documents, and Design Build Program Plan.

38.     Finally, the ARRA Grant Agreement provides that grant funds are to be disbursed as reimbursements for payments previously made by the Authority.  In addition, the Agreement permits FRA to authorize a disbursement only if the Authority is (a) "complying with its obligations under [the] Agreement" and (b) "making adequate and timely progress toward Project completion."

**B.     The FY 10 Grant**

39.     In 2010 and 2011, FRA awarded the Authority two additional grants, both under the 2010 Appropriations Act, totaling $928,620,000: an award of $715 million requiring a 30 percent match, and an award of a little more than $213 million requiring a 20 percent match. Proposition 1A bond proceeds were again to provide the source of California's matching funds.

40.     On November 18, 2011, FRA and the Authority executed an agreement concerning these grants ("FY 10 Grant Agreement").

41.     The FY 10 Grant Agreement was intended to provide funds to complete the Project funded by the ARRA Grant Agreement, and the statement of work in the FY 10 Grant Agreement therefore includes six tasks identical to six of the ten tasks in the statement of work in the ARRA Grant Agreement.

42.     The FY 10 Grant Agreement also contains many other provisions of the ARRA Grant Agreement, including those requiring FRA oversight and approval.  Like the ARRA Grant Agreement, the FY 10 Grant Agreement does not contain a time-is-of-the-essence clause, a construction timeline or a completion deadline for the San Francisco to Anaheim phase of the high-speed rail system.

**III.   CALIFORNIA'S COMPLIANCE WITH THE GRANT AGREEMENTS AND SUBSTANTIAL PROGRESS ON THE PROJECT**

43.     Since executing the ARRA Grant Agreement and the FY 10 Grant Agreement, the Authority has made substantial progress on the Project.

44.     Over 90 percent of the design work on the Project has been completed, and 82 percent of the rights of way needed for the Project have been obtained and delivered to the Authority's contractors.

45.     State Route 99, the main highway through the Central Valley, has been realigned, and the realignment of other roads and utilities is in progress.

46.     Over 44 miles of grading and embankment work is either finished or in progress.

47.     Two overhead crossings, a bridge, and a viaduct have been completed; two other viaducts as well as a trench in Fresno are in progress; and abutments for bridges are being constructed.

48.     In total, there are more than 24 active or completed construction sites in the Central Valley, and the Project is currently employing more than 2,600 workers in the Central valley, engaging 500 small businesses, and has generated nearly $7.2 billion in economic output.

49.     As required by the ARRA statute, the Authority spent all of its ARRA funds by September 30, 2017, and having already spent $970 million in state funds, the Authority is well on its way to matching the $2.5 billion in ARRA funds spent on the Project (after which it will draw on the FY 10 Grant Agreement monies).  In addition, the State has committed an additional $3.1 billion in funding toward the Project.

50.     The FRA has closely monitored the Authority's performance under the ARRA Grant Agreement.  Among other things, the Authority has provided regular reports and updates allowing the FRA to verify that the Authority is in compliance with a variety of grant requirements.  In addition, FRA and the Authority have annually conducted a Site Monitoring Review designed to provide the Authority and FRA an opportunity to review issues that have arisen over the previous year and address any ongoing or anticipated future needs and concerns.

51.     In spite of this close monitoring, the FRA has only once issued a finding demanding corrective action from the Authority.  This occurred in 2014, and the Authority promptly implemented a corrective action plan, which resolved the matter.

52.     FRA repeatedly has recognized that the Authority was complying with the ARRA Grant Agreement and making substantial progress on the Project.

53.     As noted above, under the ARRA Grant Agreement, the FRA is permitted to release funds only if it finds that the Authority is "complying with its obligations under [the ARRA] Agreement," and "making adequate and timely progress toward Project completion."

54.     Far from withholding funds based upon any failure to comply or make substantial progress, from March 2011 through September 2017, the FRA approved 459 separate disbursements totaling $2.5 billion.

**IV.    THE FEDERAL RAILROAD ADMINISTRATION'S PRIOR COOPERATIVE APPROACH**

55.     Major infrastructure projects face challenges at every stage—from planning, funding, environmental review, and acquisition of private property to the physical challenges of construction—that cannot be fully predicted or addressed until they occur.  Consequently, such projects require the cooperation and patience of numerous agencies.

56.     Until the recent change in administration, the Authority and FRA enjoyed such cooperation, and they collaborated effectively toward their common goal of achieving the first true high-speed rail system in the United States.

57.     Recognizing the need for flexibility, both the ARRA Grant Agreement and the FY 10 Grant Agreement permit amendments, and in fact the ARRA Grant Agreement was amended six separate times and the FY 10 Grant Agreement once.

58.     For example, in 2012, after litigation challenging California's ability to use Proposition 1A bond proceeds on the Project was filed, FRA and the Authority amended the ARRA Grant Agreement to allow a tapered match payment arrangement whereby the federal ARRA funds would be used first until fully expended, after which the State would spend its funds until the federal expenditures are fully matched.

59.     In late 2013, while the same litigation was on appeal, FRA and the Authority also agreed to slow down Project construction, pending the results of the appeal or access to alternative state matching funds.  And in 2014, with Proposition 1A bond proceeds still tied up in litigation, the California Legislature allocated to the Authority 25 percent of the revenues from the State's auction of greenhouse gas emissions allowances, so that the Authority would have another source of State funds available for matching the federal grant funds.

60.     In 2016, FRA and the Authority amended the ARRA Grant Agreement to extend the Project performance period from September 2017 to December 2022, and in 2017, they similarly amended the FY 10 Grant Agreement to extend the project performance period to December 2022.  The amendments also extended the length of the segment by approximately 2.5 miles to the north to allow better connectivity to the Madera Amtrak station used for intercity passenger train travel between Sacramento and Bakersfield.

61.     The Authority is lead agency on obtaining state environmental clearances under the California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code § 2100 *et seq.,* while FRA is lead agency on obtaining federal environmental clearances under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*  Assignment of FRA's NEPA responsibilities to the Authority would be more efficient because the environmental process involves a single NEPA/CEQA document.  Between mid-2017 and August 2018, the parties worked together on the steps needed to effectuate the assignment.

62.     FRA and the Authority also worked closely between 2012 and late 2018 to come up with an acceptable intrusion barrier between the tracks used by freight trains and the high-speed rail tracks in the Central Valley, to prevent derailed freight trains from intruding into the Authority's trackway and to prevent errant passenger trains from intruding into the trackway used by freight trains.

V.     THE RECENT CHANGE IN THE FEDERAL RAILROAD ADMINISTRATION'S APPROACH

63.     Beginning in 2018, however, FRA effectively ceased cooperating on the Grant Agreements.

64.     For example, the Authority is informed and believes, and thereupon alleges, that FRA's monitoring report for 2017 was completed on or about February 12, 2018, the date shown on the report.  FRA, however, did not provide the report to the Authority until June of 2018.  Similarly, FRA completed its 2018 site visit in November, 2018, but has still not provided the Authority with its 2018 monitoring report.

65.     FRA also has ceased to cooperate in the environmental review process.  All steps for securing assignment of FRA's NEPA responsibilities to the Authority had been completed by

1    June 2018, and FRA ostensibly continued to work toward implementation as late as August 2018,

2    but FRA never executed the assignment, despite the fact that FRA management orally assured the

3    Authority that there was no policy disagreement about the NEPA assignment and that approvals

4    of the assignment were imminent.

5            66.    To make matters worse, in September 2018, FRA ceased all environmental

6    clearance work on the Project.

7            67.    As a result, the Authority's efforts to obtain NEPA environmental clearances have

8    ground to a halt.

9            68.    In addition, as of February 18, 2019, FRA had cancelled all previously scheduled

10   meetings with the Authority, declined to attend any meetings scheduled by the Authority, and

11   stopped responding to communications from the Authority.

12   **VI.    THE EXPANDED CENTRAL VALLEY CONSTRUCTION PLAN**

13           69.    Since 2014, the Authority has been considering a plan to expand construction in

14   Central Valley.

15           70.    The ARRA Grant Agreement and the FY 10 Grant Agreement authorize the use of

16   federal grant money to construct a 119-mile segment from Madera to a point approximately

17   15 miles north of downtown Bakersfield.

18           71.    The expanded construction plan under consideration would extend the segment by

19   52 miles so that it would reach north from Madera to Merced and south into downtown

20   Bakersfield.

21           72.    This expanded construction plan would tie together three of the largest cities in the

22   Central Valley, three major universities, and three of California's fastest growing counties.

23           73.    The expanded construction plan also would provide transit connectivity in the

24   north with the Altamont Corridor Express and Amtrak trains traveling to Sacramento and the Bay

25   Area, as well as connectivity in the south to bus services from Bakersfield to Los Angeles.  The

26   plan is consistent with the California State Rail Plan released by the California Transportation

27   Agency in 2018.

28           74.    California currently is responsible for all Project costs in excess of the federal

1  grant funds and the state's matching funds combined.  If the decision is made to expand to

2  downtown Bakersfield, California would be responsible for those additional costs, as well,

3  bringing its share of the total cost of the expanded Project to 82 percent.

4       75.    On February 12, 2019, Governor Newsom delivered the State of the State address

5  to the California Legislature, and in that address, he endorsed the expanded Central Valley

6  construction plan.

7       76.    The Governor announced that his administration would adopt a pragmatic

8  approach with an immediate focus on completing a high-speed rail link between Merced and

9  Bakersfield, stating that "we'll connect the revitalized Central Valley to other parts of the state."

10       77.    At the same time, Governor Newsom confirmed that he shared the ambitious

11  vision for high-speed rail of his predecessors Governors Brown and Schwarzenegger, and would

12  finish environmental work for the entire Phase 1, San Francisco to Los Angeles area segment.

13       78.    Also on February 12, Brian Kelly, the Chief Executive Officer of the Authority,

14  confirmed in a news release the Authority's commitment to: (i) getting high-speed rail operating

15  in the Central Valley; (ii) completing the environmental work state-wide; (iii) continuing the

16  Authority's investments in the Bay Area and Anaheim portions of the high-speed rail system; and

17  (iv) pursuing additional funding for future project expansion.

18  **VII.  TERMINATION OF THE FY 10 GRANT AGREEMENT**

19       79.    In addition to endorsing the expanded Central Valley construction plan, in his

20  State of the State address Governor Newsom challenged President Trump's claim that there was

21  an emergency at the border between the United States and Mexico.  "The border 'emergency,'"

22  the Governor said, "is a manufactured crisis."  Declaring that "California will not be part of this

23  political theater," Governor Newsom announced that two-thirds of the California National Guard

24  forces currently on the border would be redeployed to assist Cal Fire in preparing for fire season

25  and to boost the National Guard's statewide Counterdrug Task Force.

26       80.    The next day, on February 13, 2019, President Trump inaccurately tweeted that

27  "California has been forced to cancel the massive bullet train project" and that "[t]hey owe the

28  Federal Government three and a half billion dollars.  We want that money back now."

81.     That same day Governor Newsom clarified that the high-speed rail project had not been "cancelled," and affirmed that California is "building high-speed rail, connecting the Central Valley and beyond."

82.     Five days later, on February 18, 2019, California led a coalition of 16 states in filing a lawsuit challenging President Trump's declaration of an emergency at the border and his announcement that he would use funds *not* appropriated by Congress for the border wall to construct portions of the wall for which Congress had denied appropriations requests.

83.     The following morning, on February 19, 2019, President tweeted a response directly linking the border wall litigation with California's high-speed rail project: "[a]s I predicted, 16 states, led mostly by Open Border Democrats and the Radical Left, have filed suit in, of course, the 9th Circuit!  California, the state that has wasted billions of dollars on their out of control Fast Train, with no hope of completion, seems in charge!"

84.     One minute later, President Trump tweeted that "[t]he failed Fast Train project in California, where the cost overruns are becoming world record setting, is hundreds of times more expensive than the desperately needed Wall."

85.     Later that same day, in a three-page letter FRA notified the Authority of its intent to terminate the FY 10 Grant Agreement effective March 5, 2019, and to de-obligate the funds immediately after that.  A true and correct copy of the notice of termination letter is attached hereto as Exhibit A and incorporated herein by this reference.

86.     The letter asserted four grounds for termination.  First, it asserted that California has failed to make required expenditures based on its supposed failure to meet contribution rates described in its quarterly Funding Contribution Plan.  Second, it asserted that the FRA had determined that the Authority would not complete the Project by 2022 based on the reports from the Authority's Board of Directors.  Third, it asserted that the Authority had failed to submit critical grant deliverables.  Fourth, it asserted that the Authority had failed to take appropriate corrective action.

87.     The FRA's letter asserted as well that there had been "a significant change in the State of California's plans for its high-speed rail," and that in the State of the State address,

1    Governor Newsom "presented a new proposal that represents a significant retreat . . . and

2    frustrates the purpose for which Federal funding was awarded (i.e., an initial investment in the

3    larger high-speed rail system)."

4           88.    The FRA gave the Authority two weeks to respond to the assertions in its letter.  In

5    addition, FRA stated that it was "exploring all available legal options, including termination of

6    [the ARRA Grant Agreement] and the recovery of the Federal funds expended under" that

7    agreement.

8           89.    The Authority timely responded to FRA's notice of intent to terminate on March 4,

9    2019.  A copy of the Authority's response letter is attached hereto as Exhibit B and incorporated

10   herein by this reference.

11          90.    The Authority's response included a detailed, point-by-point refutation of the

12   assertions in the FRA's letter.  For example, the Authority's response showed that California had

13   accepted a much higher matching percentage, nearly 50 percent of the total Project cost, than

14   ordinarily required for railroad construction grants, and the expanded Central Valley construction

15   plan endorsed by Governor Newsom would increase California's share of the cost to over 70

16   percent.  As of December 2018, the Authority already had submitted for FRA approval $970

17   million in state-funded invoiced expenditures, which is 39 percent of California's $2.5 billion

18   match requirement, even though only 26 percent of the period for making these expenditures had

19   expired.

20          91.    The Authority's response also showed that the notice's assertion the Authority will

21   not complete the Project by December 31, 2022 contradicts the Board of Directors reports upon

22   which the FRA purported to rely.  Those reports in fact project that most work on the Project will

23   be completed by March 2022, and the four remaining tasks will be completed by the end of that

24   year.  The response also showed that there is no time-is-of-the-essence clause in the ARRA Grant

25   Agreement and that failure to meet the December 31, 2022 deadline would not be a material

26   breach of the Agreement.

27          92.    The Authority's response showed as well that the Authority has made substantial

28   submissions to the FRA and, far from finding these submissions inadequate, FRA implicitly

1  acknowledged their sufficiency by making 459 payments under the ARRA Grant Agreement

2  through September 2017.  The response also showed that the FRA has issued only one demand

3  for corrective action, and the Authority took that action in 2014.

4        93.     Finally, the Authority's response showed that Governor Newsom's plan was not

5  new and that it did not retreat from or frustrate the ultimate goal of California's high-speed rail

6  system.  To the contrary, Governor Newsom endorsed a plan that expands the construction

7  project authorized by the ARRA Grant Agreement and FY 10 Grant Agreement and that furthers

8  the overall goal of the high-speed rail program by ensuring that the first segment will provide

9  tangible benefits to the region and transportation connectivity both north and south.

10        94.     Nevertheless, on May 16, 2019, FRA sent a letter to the Authority that announced

11  its "final decision . . . that [FRA] has, effective today, terminated the [FY 10 Grant Agreement]."

12  (A copy of FRA's letter is attached hereto as Exhibit C and incorporated herein by this reference.)

13        95.     In sharp contrast to its earlier notice letter, which devoted only a single paragraph

14  to the supposed failure to submit grant deliverables, the termination letter makes the failure to

15  submit grant deliverables the primary ground for termination and devotes over a dozen full pages

16  to discussing the issue.  While the notice letter refers vaguely to "over 40 reports and

17  deliverables," without specifying any particular deliverable or deficiency, the termination letter

18  discusses in detail a long list of supposed problems with various reports, budgets, and other

19  documents.

20        96.     The termination letter also finds that the Authority will not complete the Project by

21  2022.  It does not dispute, however, that the Authority reports cited in the notice letter show

22  completion by that date.  Instead, the FRA purports to base its final termination decision on an

23  "independent assessment, including its risk analysis," that was not previously disclosed.

24  Moreover, the termination letter discloses only the supposed results of that analysis, not the

25  analysis itself.

26        97.     The termination letter also finds that the Authority has not achieved its necessary

27  contribution rates, based largely on the fact that "to date" the FRA has not accepted all of the

28  expenditures submitted by the Authority.

16

98.     Finally, the termination letter accuses California of retreating from a "foreseeable statewide HSR system," though it acknowledges that this retreat "may not, standing alone, constitute a violation of the FY10 Agreement."

99.     The final decision stated that FRA will "deobligate the $928,620,000 in funding obligated by the FY 10 Agreement," and that it plans to award the "deobligated FY10 Appropriation funds" to other inter-city passenger rail projects.

## VIII. THE FRA'S DEPARTURE FROM ORDINARY AGENCY PRACTICE

100.     The FRA's final decision to abruptly terminate the FY 10 Grant, rather than work with the Authority and impose graduated sanctions as needed in an attempt to secure compliance, was a sharp departure from ordinary agency practice.

101.     At the time the FY 10 Grant Agreement was executed, DOT regulations provided that the remedies imposed for non-compliance with a grant or cooperative agreement should be "appropriate in the circumstances" and range from "[t]emporarily withholding cash payments pending correction of the deficiency" to more serious measures such as disallowing the use of funds and matching credit for "all or part of the cost of the activity not in compliance," to "wholly or partly suspend[ing] the current award" or "withholding future awards."  49 C.F.R. § 18.43(a)(1)-(5).

102.     DOT's Financial Assistance Guidance Manual ("DOT FAGM"), issued March 2009, similarly provided that '[e]nforcement measures should match the seriousness of the problem," that the agency official "should apply sound judgment in determining what enforcement measures are appropriate for a situation," and suggested escalating sanctions if needed to secure compliance rather than termination.

103.     Effective December 26, 2014, the federal government adopted uniform remedies provisions for DOT and other agencies that administer federal grants.  Under these regulations, when a grantee fails to comply with the terms and conditions of an award, the awarding agency may "impose additional conditions."  Additional actions, such as suspension or termination, may be taken only "if noncompliance cannot be remedied by imposing additional conditions." 2 C.F.R. § 200.

17

104.    In 2016, DOT published a Financial Assistance Manual, which states that, after identifying a material violation of a grant or cooperative agreement and attempting resolution, the FRA/DOT should work with "Senior Management" and specified others within the agency "to determine the appropriate course of action."  In addition, if preliminary measures fail to bring a recipient into compliance, the recipient generally will not be terminated immediately; instead, it will be suspended and given an opportunity to take appropriate corrective action.  However, "[i]f the deficiencies are not corrected during the suspension period, or when the deficiencies are so egregious that an end to the grant is the only appropriate option, the [agency] should determine whether to proceed with termination."

105.    DOT practice, consistent with the DOT Manual, is to address grant compliance issues with escalating sanctions.  That process starts with providing assistance, and if such assistance does not resolve the problem, notifying the grant recipient of a need for corrective action.  Only if these measures are not successful, and the grantee fails to take corrective action, is the harsher remedy of suspension considered.  The draconian measure of termination is appropriate only in the most egregious circumstances.

106.    The termination letter does not explain why the FRA decided to depart from ordinary agency practicing in terminating the FY 10 grant without imposing lesser sanctions first. Nor does the letter explain why the FRA terminated the grant now, even though the FRA is not scheduled to use those funds until it has completed its required matching of the ARRA grant funds.

## CLAIM FOR RELIEF

### Administrative Procedure Act

107.    Plaintiffs State of California and the Authority incorporate the allegations of the preceding paragraphs by reference.

108.    The Administrative Procedure Act, 5 U.S.C. § 706, authorizes this Court to set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

109.    FRA's decision to terminate the FY 10 Grant Agreement and de-obligate the funds

18

1    awarded under the Agreement it is contrary to its policies, procedures, and regulations, as well as

2    its ordinary practices, which require that FRA first work with a grantee to address any non-

3    compliance and, if that fails, proceed to issue a demand for corrective action, before it considers

4    suspension, much less termination of a grant.  Moreover, the FRA's termination letter failed to

5    provide any explanation for departing from its policies and ordinary practices.

6            110.    Defendants' rationale for terminating the FY 10 Grant Agreement is also

7    inconsistent with the parties' performance and course of dealings under the Agreement, including

8    but not limited to the fact that, prior to the change in presidential administrations, FRA had

9    consistently determined that the Authority was in compliance with the ARRA Grant Agreement

10   (and by extension, the FY 10 Grant Agreement, which does not even kick in until the State has

11   finished matching the ARRA grant funds).

12           111.    Plaintiffs are informed and believe and thereupon allege that Defendants'

13   termination decision was not based on an examination of the relevant data, and that Defendants

14   did not provide or articulate a satisfactory explanation for their action, including a rational

15   connection between the facts found and the choice made.  Rather, the decision was precipitated

16   by President Trump's overt hostility to California, its challenge to his border wall initiatives, and

17   what he called the "green disaster" high-speed rail project.

18           112.    Defendants' unilateral decision to terminate the FY 10 Grant Agreement and to

19   refuse to continue the cooperative work on the Project also is directly contrary to the statutory

20   requirement and congressional mandate that the Secretary "make grants for high-speed rail

21   projects . . . and capital investment grants to support intercity passenger rail service."  Pub. Law

22   11-117, 123 Stat. at p. 3056 (Dec. 16, 2009).  FRA's termination of the FY 10 Grant Agreement

23   will cause significant damage to the only true high-speed rail project being developed in the

24   United States.

25           113.    Accordingly, the Court should set aside the FRA's termination decision and

26   preliminarily and permanently enjoin Defendants from re-obligating or otherwise transferring the

27   funds to other activities, programs, or recipients.

28

# PRAYER FOR RELIEF

WHEREFORE, the Authority respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.      That the Court issue a judicial declaration that Defendants' decision to terminate the FY 10 Grant Agreement was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

2.      That the Court enter a judgment setting aside the termination decision;

3.      That the Court enter a preliminary injunction, followed by a permanent injunction, enjoining Defendants from re-obligating the grant funds to another grantee or otherwise transferring the funds; and

That the Court grant such other relief as the Court may deem just and proper.

Dated: May 21, 2019                                   Respectfully submitted,

XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorneys General
ANNA T. FERRARI
Deputy Attorney General


/s/ Sharon L. O'Grady
SHARON L. O'GRADY (SBN 102356)
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102
 Telephone: (415) 510-3834
 Fax: (415) 703-1234
 E-mail: Sharon.OGrady@dj.ca.gov
*Attorneys for Plaintiffs State of California and California High-Speed Rail Authority*

Complaint for Declaratory and Injunctive Relief